**Affidavit in Support of Criminal Complaint**
**For Antonio PEÑA and Brandi DURST**

Your Affiant, Special Agent Christopher J. Roby, Internal Revenue Service – Criminal Investigations (IRS-CI), being duly sworn, deposes and says:

1.  I am a Special Agent employed by IRS-CI currently assigned to the office in Louisville, Kentucky. I have been employed as a Special Agent within the Department of Treasury since April 2017 . As such, I am responsible for investigating financial crimes against the United States and its citizens, including various forms of fraud, money laundering, identity theft, narcotics trafficking, and tax violations among others. I have completed training at the Federal Law Enforcement Training Center in Glynco, GA where training was conducted pertaining to these types of investigations.

2.  I am a law enforcement officer of the United States within the meaning of Section 115(c)(1) of Title 18, United States Code, and empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 1956(h).

3.  This affidavit is based upon my personal knowledge and upon information reported to me by federal and local law enforcement officers and others with knowledge of the case. Unless specifically indicated otherwise, all conversations and statements described in the affidavit are related in substance and in part only. This affidavit does not contain every fact known to me through this investigation. The facts relayed are for the purpose of establishing probable cause that ANTONIO PEÑA, BRANDI NICOLE DURST, and others have participated in a money laundering conspiracy (under 18 U.S.C. § 1956(h)) for the purpose of concealment (i.e. concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)), with the proceeds of wire fraud, a specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7).

## UNDERLYING WIRE FRAUD – GOLD BAR SCAM

4. My involvement with the investigation underlying this case began in July 2024, based on reports to law enforcement from Victim 1, that she had been the victim of what's commonly known as a "Gold Bar Scam." Information related to the Gold Bar Scam against Victim 1 was relayed by the victim and verified through grand jury subpoenas and other investigative measures.

5. Gold Bar Scams, which have become increasingly common in recent years, typically begin by way of computer pop-up that provide a phone number to call. Once called by the intended victim, fraudsters begin a deceitful relationship with victims where, by posing as tech-professional, bank representatives, and government agents, they build a trusting relationship with the victims. This is commonly done by creating a sense of fear in the victims with stories of imaginary fraudsters attempting to exploit the victim's identity for monetary gain. By warning the would-be victims of future exploitation at the hands of others, along with the appearance of protection, over time the victims begin to trust the callers. Callers often try to isolate the victims by telling them that everyone is a suspect of the attempted hackings and access and to not trust bank professionals (at the bank) and even family. As this relationship materializes, fraudsters are working toward a large prize, typically one's retirement account(s). To do this, they will have the accountholders convert funds from one or more retirement account into gold bars for pickup.

6. The conversion into gold serves multiple purposes; gold is seen by most, including the elderly (the typical targets of this scam), as secure and is more familiar than a conversion into cryptocurrency, and gold is, by its nature, very difficult to trace, allowing it to reach areas of international interest without typical traces left behind by standard financial transactions. The difficulty of tracing gold, the fact that it can be moved internationally without requiring currency

exchange, and the ability to trade it for currency to reenter the financial system without tying it back to its sources, makes it a useful tool for concealment money laundering. Concealment money laundering (under 18 U.S.C. § 1956(a)(1)(B)), occurs when a person, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. In this instance, the specified unlawful activity at issue is wire fraud (under 18 U.S.C. § 1343), as fraudsters utilize interstate and international wires through the internet, phone calls, and financial transactions, e.g. wire transfers, to carry out Gold Bar Scams.  Conspiracy to commit concealment money laundering and other forms of money laundering is charged under 18 U.S.C. § 1956(h).

CONDUCT IN THE WESTERN DISTRICT OF KENTUCKY

7. In this case, as in the typical Gold Bar Scam case, Victim 1, a Louisville, Kentucky resident, was contacted, on or about April 3, 2024, about an alleged computer scam where she was deceived into thinking she was dealing with representatives from Microsoft.  The next day, April 4, 2024, the alleged representative from Microsoft, known to Victim 1 as Jeslyn Miller ("Miller"), told Victim 1 that she contacted Cody Holmes ("Holmes"), allegedly from Truist Bank where Victim 1 is a customer. In the days following, frequent calls were made by "Miller" to Victim 1, in what the latter referred to as "security calls" in the morning and evening.  This pattern of calls continued to at least June 12, 2024, as the scam against Victim 1 became more elaborate and consuming.

8. On April 5, 2024, "Holmes" told Victim 1 to set up an account with Discover Bank where Victim 1 took proceeds from her Truist Bank account and wired them to the newly created

Discover account. This was done due to planted fear from callers and caused a transfer of $76,241.54 to be sent to the new account. A few days later, on April 8, 2024, "Holmes" called and informed Victim 1 that Discover Bank was hacked and to wire funds overseas to Industrial and Commercial Bank of China with the beneficiary, Jin Long. Two days later, on April 10, 2024, "Holmes" instructed Thompson to close her Delaware Life account and move the funds ($56,596.48) into her Truist account, from which she ultimately purchased gold from JM Bullion later in the month. This order of gold was ultimately picked up on May 15, 2024, by a person identified as "Nick," allegedly an agent with the Federal Reserve. Before the pickup, Victim 1 was directed by the scammers to close her T. Rowe Price IRA account which held $550,592.38. On May 20, 2024, Victim 1 ordered more gold from JM Bullion, this time in the amount of $530,369.60.

9. On May 24, 2024, Victim 1 received the additional gold (worth $530,369.60). The following day, on May 25, 2024, the gold was picked up by someone alleged to be a Federal Reserve agent named "Patrick," who was later positively identified as ANTONIO PEÑA (PEÑA), the subject of this investigation. Based on Victim 1 statements, investigators were able to secure video surveillance of this gold pickup occurring in a commercial parking lot in Louisville, KY. Investigators were then able to identify the car being used by "Patrick" (PEÑA) during the pickup. With that information in hand, investigators were able to trace PEÑA back to the airport and to the rental counter where he rented the vehicle used.

10. On May 25, 2024, PENA was observed by video deboarding Delta flight 3957 at approximately 5:30 pm at Louisville International Airport (SDF). By approximately 5:39 pm PEÑA had reached Enterprise Rent-A-Car counter to rent a Jeep Cherokee in the name of Lockton Management LLC. The vehicle carried a Georgia license plate (CVZ5754). PEÑA's vehicle was

4

observed by Flock camera heading towards the meet-up location with Victim 1. Surveillance footage shows the meet location as the parking lot seemingly shared by Home Depot and Chick-fil-a located near 2600 S. Hurstbourne Parkway in Louisville, KY. At approximately 6:44 pm PEÑA approaches Victim 1's car and retrieved more than $500,000 in gold out of the trunk of her white sedan.

11. While the pickup was about to happen, Victim 1 was on the phone with "Holmes." Victim 1 provided "Holmes" with her license plate number and her car description. Victim 1 detailed how the gold was heavy, roughly 20-30 pounds. PEÑA, going by the name Patrick, lifted it from her trunk. Victim 1 confirmed that PEÑA identified himself as "Patrick" to her, which matched the name she'd been given by scammers over the phone. Victim 1 described "Patrick" (PEÑA) as a tall, black male who was thin.

12. PEÑA's travels to Louisville were paid for by a known associate and subpoenaed records confirm such purchases. PEÑA returned the rental car to SDF the day after the gold pickup. PEÑA established Bank of America account ending in 2192 on May 28, 2024 at the Astoria – Steinway Financial Center in New York.

12. An additional pick-up of gold was carried out by a woman identified as "Linda" to Victim 1. Victim 1 described Linda as appearing to be Indian. This occurred on June 7, 2024 and the purchase of gold was made possible by a check received via mail by Victim 1 from another victim in this case. This check amounted to $91,400 and this Victim, from New Mexico, is party to the same scheme.

13. Records received since have shown PEÑA, a former collegiate and international professional basketball player, listed as standing approximately 6'8" to 6'9", to travel extensively across the United States, while bank records obtained via subpoena fail to support any legitimate

5

employment or income sources. Reports from Gold Bar Scam victims in other jurisdictions have been linked to the scam against Victim 1 through various means, including shared details between the misrepresentations used (e.g. similar explanations and the same aliases used), transactions between scam victims carried out at the direction of the scammers, pickups of proceeds being carried out by the same individuals, including those named in this Complaint, and other means.

### ADDITIONAL CONDUCT IN THE CONSPIRACY BEYOND THE WESTERN DISTRICT OF KENTUCKY

#### Eastern District of Kentucky

14. On or about March 5, 2025, Victim 2, a resident of Danville, Kentucky, was contacted in a similar manner to Victim 1, through a pop-up on her computer. Also, similar to Victim 1, scammers were able to convince Victim 2 to transfer money out of her bank account into accounts controlled by the scammers. Scammers also convinced Victim 2 to make cash withdraws that were then picked up by individuals purported to be "officers" from Chase Bank, who would supposedly take Victim 2's money and keep it safe. Victim 2 discussed the situation with a family member and realized she was being scammed. Through law enforcement, Victim 2 carried out a controlled call with a scammer known to her as "Troy" who arranged another cash pick up on May 17, 2024, with an officer identified as "Linda."

15. Through this ruse the woman identified as "Linda" who arrived for the pick-up (hereinafter Cooperating Defendant or CD), was arrested and agreed to speak to law enforcement. Linda/CD, a woman of Indian descent, explained that she and her husband were being paid to make pick-up of packages and take them to other locations at the direction of someone in India known to them as "Cow." Cow communicated directly with CD's husband, who would sometimes relay instructions to CD for pick-ups.

16.     While law enforcement intervened before Victim 2 purchased any gold bars, the scams carried out against Victim 1 and Victim 2 are directly linked, as evidenced by the use of Linda/CD to carry out proceed pickups and through the recovery of a shipping label in CD's car from JM Bullion addressed to Victim 1, dated May 1, 2024 and detailing Victim 1's shipment of gold bars. The information provided by CD also shows the intent to carry out further movement of/transactions with the proceeds and coordination between the individuals picking up proceeds and foreign actors coordinating the fraud and money laundering activities.

Eastern District of Wisconsin

17.     The Eastern District of Wisconsin has seen multiple cases where PEÑA is involved in the same Gold Bar Scam.  Two of such cases, with victims in Waukesha, Wisconsin and Grand Chute, Wisconsin, are described below.

18.     Victim 3, of Waukesha, Wisconsin, was initially contacted through a pop-up notification on or about February 27th or 28th, 2025 while playing a game on her personal computer informing her, she had been hacked and a phone number to reach out to for help.  Victim 3, like others, spoke with a series of fraudsters holding themselves out as intending to "help" her and protect her assets from scammers. Victim 3 carried out transactions at the direction of the scammers and was eventually persuaded by someone using the name "Adrian" to purchase gold to be picked up by others. On or about March 10, 2025, Adrian arranged for two pickups of the gold Victim 3 acquired. These pickups occurred on consecutive days by a female, known to Victim 3 as "Jennifer" and later identified as Brandi Nicole DURST (DURST).  Investigators relied on Victim 3's description, footage from the apartment complex, and Flock cameras to identify a license plate number associated with "Jennifer." From there, they determined it was an Avis rental and that rental came back as rented by DURST. DURST fits the physical description

of the one who picked up from Victim 3 as well. After retrieving the gold from Victim 3, DURST met with PEÑA, who was driving a 2024 gray Chevrolet Malibu that records show he had rented in Chicago, Illinois.

19. On December 23, 2024, Victim 4 reported to the Grand Chute, Wisconsin Police Department to that she had conducted a series of transactions with gold bars or gold coins, similar to those carried out by other victims, at the direction of unknown scammers. Victim 4 was first contacted by the scammers on August 16, 2024 through texts and calls from various phone numbers. Victim 4 reported six transactions between her and the scammers, with the first transaction in cryptocurrency and the other five transactions involving the purchase of gold through "Voecks Fox Valley Coin and Diamond's." The last transaction, occurred on December 14, 2024. Every time a transaction happened Victim 4 met a different car and a different person picking up the gold.

20. Victim 4 maintained extensive notes which annotated dates and amounts of gold for each transaction. She provided the following details about the transactions:

- August 16, 2024- Coin Hub transaction ($13,000)
- September 10, 2024- 260,134.60 (22 Karat Gold Eagle) (97 Gold coins)
- October 11, 2024- $401,292.00 (24 Karat) (142 Gold Bars)
- October 25, 2024- $461,120.00 (24 Karat) (160 Gold Bars)
- November 22, 2024- $451,275.00 (24 Karat) (165 Gold Bars)
- December 07, 2024- $371,774.00 (24 Karat) (130 Gold Bars)
- December 14, 2024- $323,345.50 (24 Karat) (115 Gold Bars)

Victim 4 described the male on one pickup being African American, with short hair and being tall, over six feet. The Grand Chute Police Department Detective located video footage from December

14, 2024, that captured a male matching Victim 4's description making contact with her for the final pickup. The male exited a gray Jeep bearing Illinois license plate FP248601. The Grand Chute Police Department ran the license plate identifying it as a rental.

21. On January 22, 2025, the Grand Chute Police Department Detective obtained a subpoena related to the rental. On January 24, 2025, Enterprise responded with records indicating the vehicle was rented at Midway International Airport in Chicago on December 13, 2024. The vehicle was rented by PEÑA. The Grand Chute Police Department Detective obtained a Florida driver license photograph of PEÑA and compared it to the video from when the vehicle was rented. The Grand Chute Police Department stated that the photograph of PEÑA appeared to be the same individual shown in the images of the vehicle rental.

<u>Western District of Missouri</u>

22. In the summer of 2024, Victim 5 of Kansas City, Missouri was targeted by a group conducting a gold scam. The victim there told investigators that a notification appeared on his computer detailing a virus present. The victim stated the message contained the Microsoft logo and provided a phone number to call to resolve the issue which he/she phoned. The recipient of the victim's call was a female and remotely accessed the victim's computer. The scheme soon evolved into the compromising of the Victim 5's bank accounts and caused the victim to purchase roughly $275,000 in gold. Callers purporting to belong to the victim's financial institution advised that representatives from the Federal Reserve would retrieve the gold.

23. Callers told the victim to meet agents with the Federal Reserve at a defined location in Kansas City, Missouri, but instead agents with Homeland Security Investigations (HSI) posed as the victim and arrived at the meeting location. There, DURST was observed wearing a Bluetooth earpiece and was examining vehicles in the parking lot, including the vehicle driven by

HSI. Soon thereafter an individual later identified as Tommie Hampton approached the vehicle and investigators also noted Hampton wearing a Bluetooth device. Further, agents noticed that upon approach, Hampton's phone was connected to an active voice call. While officers were detaining Hampton, they noticed DURST leave the parking lot at a high rate of speed.

24. In a post-*Miranda* interview, Hampton stated DURST recruited him to help her, but that he was unaware of what the package contained. Further, Hampton mentioned that he was aware that what he and DURST were doing was "more likely than not" illegal. Hampton consented to a search of his cellular device where the following messages were found:

"Once you take the package from him;"

"Handover to me;"

"I will meet you somewhere near;"

"And will handover you the cash;"

"Don't keep my package bro;"

"I hire you only for this;"

"And don't open the package," "It's ours," and "My boss will be mad."

Hampton told investigators this was his first time doing a retrieval but believed DURST had retrieved packages several times prior. Hampton stated he travelled from Tampa, Florida to Kansas City, Missouri and met a man at a bar who appeared and sounded Middle Eastern. Hampton also detailed that he and DURST surveilled the victim the morning of the sting operation and intended to follow the victim to the meeting location from his residence.

<u>Western District of Washington</u>

25. On the evening of July 17, 2025, investigators became aware of PEÑA and DURST having been arrested by local authorities on the heels of a sting operation involving the same type

of Gold Bar Scam carried out in Clark County, Washington. The Clark County Sheriff's Office was aware of recent pickups from victims in the area and coordinated with local FBI personnel. Callers were expecting to receive roughly $500,000 in gold and informed the victim it would be picked yup by a black male. When leaving the residence (with law enforcement hiding in the vehicle), the driver victim noted he was being followed. When they arrived at the meet location. PEÑA approached the car, but upon noticing law enforcement, attempted to flee. The following vehicle then attempted to leave the scene, but was stopped, and its driver was DURST. They have been charged locally in Clark County, Washington.

> /s/ Christopher J. Roby
> Christopher J. Roby
> Special Agent, IRS-CI
> Louisville, Kentucky

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephonic and email submission on this the 19th day of July 2025.

> Hon. Colin H. Lindsay
> United States Magistrate Judge